**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

<table>
<tr><td>ONÉSIMUS DEFENSE LLC,</td><td>)</td><td></td></tr>
<tr><td></td><td>)</td><td></td></tr>
<tr><td>Plaintiff,</td><td>)</td><td>No. 24-867</td></tr>
<tr><td></td><td>)</td><td></td></tr>
<tr><td>v.</td><td>)</td><td>Filed: September 16, 2024</td></tr>
<tr><td></td><td>)</td><td></td></tr>
<tr><td>THE UNITED STATES,</td><td>)</td><td>Re-issued: September 27, 2024[*]</td></tr>
<tr><td></td><td>)</td><td></td></tr>
<tr><td>Defendant.</td><td>)</td><td></td></tr>
</table>

## OPINION AND ORDER

In this post-award bid protest, Plaintiff Onésimus Defense, LLC ("Onésimus") contends that the United States Department of the Navy ("Navy") improperly awarded a contract for fall protection safety training to Learning For Work, LLC ("LfW"). Specifically, Onésimus alleges that the Navy disparately evaluated Onésimus's proposal and applied unstated evaluation criteria when evaluating past performance. Before the Court are the parties' dispositive cross-motions. As explained below, the Court **DENIES** Onésimus's Motion for Judgment on the Administrative Record and **GRANTS** the Government's Cross-Motion for Judgment on the Administrative Record.

## I. BACKGROUND

### A. The Solicitation

On November 20, 2023, the Navy's Naval Supply Systems Command Fleet Logistics Center Norfolk issued Solicitation No. N0018924R0009 ("Solicitation") requesting proposals for a single award indefinite-delivery, indefinite-quantity ("ID/IQ") contract with firm, fixed-price

---

[*] The Court issued this opinion under seal on September 16, 2024, and directed the parties to file any proposed redactions by September 23, 2024. As the parties did not propose any redactions, the Court reissues the opinion publicly in full.

provisions for Competent Person Fall Protection ("CPFP") training courses.  Admin. R. at 153–55, ECF No. 12-3.  The course is intended to "train and equip Navy . . . personnel who serve as the CPFP for afloat, ashore, and aviation commands or activities."[1]  AR 239.  Under the contract, the awardee will "develop lesson plans informing instructors of the information needed to instruct the Navy's CPFP course for Afloat, Ashore and Aviation."  AR 231.  The Solicitation included a Performance Work Statement ("PWS") that provided specifics on the scope of the contract, definitions of key terms, instructor qualifications and standards, contractor tasks, course requirements, government responsibilities, safety and security, and travel requirements.  *See* AR 230–49.

The Solicitation advised that the Navy would make an award to the proposal that represents the best value under the selection criteria for Technical, Past Performance, and Price factors as set forth in the Solicitation.  AR 166.  Non-price proposals were "significantly more important" in the evaluation than the price proposal.  AR 170.  And between the two non-price factors, "Technical Approach [was] more important than Past Performance."  *Id.*

Under the Technical factor, the Navy evaluated three equally weighted subfactors: Quality Control Plan, Contingency Plan, and Sample of Student Guide/Material.  AR 168, 1273.  For the first subfactor, Quality Control Plan, offerors were required to "describe in detail the offeror's plan to ensure only qualified instructors are deployed to teach the [CPFP] course and to ensure only [Navy]-approved information is delivered to students, per sections 3 and 4 of the PWS."  AR 168.  For the second subfactor, Contingency Plan, the Solicitation instructed offerors to "describe the

---

[1] Since 2021, this service has been provided by Onésimus under a contract set to terminate in 2026.  AR 40.  Because the Navy's increased demand for CPFP trainings will surpass Onésimus's contract ceiling prior to the end of its period of performance, the Navy issued the Solicitation to establish a new ID/IQ contract that meets its increased requirement.  *Id.*

method planned to replace an instructor in [the] event of an emergency, illness, or death (see PWS Section 8)." *Id.* And for the third subfactor, Sample of Student Guide/Material, offerors were to submit a sample of their lesson manual for technical review and evaluation per section 5.2 of the PWS. *Id.*

Evaluation of the Technical factor was based on "the degree to which the proposed approach meets or does not meet the threshold performance or capability requirements." AR 171. The Technical evaluation also included a risk assessment of "potential for unsuccessful contract performance." *Id.* The Solicitation provided for ratings of each Technical subfactor, according to strengths and weaknesses found in the proposals. *Id.* Combined, the subfactor ratings comprised an overall Technical factor rating. *Id.* These ratings were set forth in Table 1 of the Solicitation. *Id.*

**Table 1: Technical Approach-Combined Technical/Risk Rating Table**

| Adjectival Rating | Description |
| --- | --- |
| Outstanding | Proposal demonstrates an exceptional approach and understanding of the requirements and contains multiple strengths and/or at least one significant strength, and risk of unsuccessful performance is low. |
| Good | Proposal indicates a thorough approach and understanding of the requirements and contains at least one strength or significant strength, and risk of unsuccessful performance is low to moderate. |
| Acceptable | Proposal meets requirements and indicates an adequate approach and understanding of the requirements, and risk of unsuccessful performance is no worse than moderate. |
| Marginal | Proposal has not demonstrated an adequate approach and understanding of the requirements, and/or risk of unsuccessful performance is high. |
| Unacceptable | Proposal does not meet requirements of the solicitation and, thus, contains one or more deficiencies and is unawardable, and/or risk of performance is unacceptably high. |

AR 174. The Solicitation defined the Technical risk ratings in Table 2.

**Table 2: Technical Risk Definitions Table**

| Adjectival Rating | Description |
| --- | --- |
| Low | Proposal may contain weakness/weaknesses which have low potential to cause disruption of schedule, increased cost, or degradation of |

| | performance. Normal contractor emphasis and normal Government monitoring will likely be able to overcome any difficulties. |
|---|---|
| Moderate | Proposal contains a significant weakness or combination of weaknesses which may have a moderate potential to cause disruption of schedule, increased cost, or degradation of performance. Special contractor emphasis and close Government monitoring will likely be able to overcome any difficulties. |
| High | Proposal contains a significant weakness or combination of weaknesses which is likely to have high potential to cause significant disruption of schedule, increased cost, or degradation of performance. Special contractor emphasis and close Government monitoring will unlikely be able to overcome any difficulties. |
| Unacceptable | Proposal contains a deficiency or a combination of significant weaknesses that causes an unacceptable level of risk of unsuccessful performance. |

*Id.*

The Past Performance factor required offerors to identify up to three past contracts most relevant to the Solicitation's requirements. AR 168. The Solicitation defined a past contract as "a single contract or a single task order placed under an ID/IQ contract, a Blanket Purchase Agreement, or a Federal Supply Schedule" that was performed within five years of the Solicitation's issuance date. *Id.* In evaluating Past Performance, the Navy assessed each reference for Recency, Quality, and Relevancy. AR 172. To be determined recent, an offeror's past performance reference must have taken place within five years of the Solicitation issue date. *Id.* As to Quality, the Contracting Officer ("CO") collected and assessed all past performance information to determine the overall quality of the references, "including general trends and usefulness of the information." *Id.*

For Relevancy, the Navy evaluated each past performance reference based on its scope and magnitude relative to the Solicitation's requirements. The Solicitation defined "scope" as "experience in the areas described in the PWS." *Id.* "Magnitude" was defined as "[t]he similarity of the dollar value of actually performed work that exists between the PWS and the offeror's

4

referenced contracts." *Id.* The Relevancy determination was expressed as an adjectival rating, according to the definitions provided in Table 3 of the Solicitation. *Id.*

**Table 3: Past Performance Relevancy Rating Method**

| Adjectival Rating | Description |
|---|---|
| Very Relevant | Present/past performance effort involved essentially the same scope and magnitude of effort this solicitation requires. |
| Relevant | Present/past performance effort involved similar scope and magnitude of effort this solicitation requires. |
| Somewhat Relevant | Present/past performance effort involved some of the scope and magnitude of effort this solicitation requires. |
| Not Relevant | Present/past performance effort involved little or none of the scope and magnitude of effort this solicitation requires. |

AR 175. The Solicitation advised offerors that the Navy would assess Past Performance references for relevance (*i.e.*, scope and magnitude) in the aggregate. AR 172. This evaluation method would "allow offerors who may not have the entire scope and magnitude of the requirement under one individual contract to still be evaluated for quality if past performance with the full scope and magnitude of the requirement can be demonstrated within the allotted number of references . . . ." AR 169.

All three aspects of Past Performance (Recency, Quality, and Relevancy) were "combined to establish a single performance confidence assessment rating for each offeror." AR 172. For purposes of this assessment, the CO could also consider "the source of the [past performance] information, the context of the data, and general trends in the offeror's performance," *id.*, as well as other sources such as existing databases and communications with the offeror's references, AR 173. The Confidence Assessment could not, however, be based on past performance references that were "determined to be 'Not Relevant,'" or on "the quality of performance under a past performance reference that has no relevance to the instant requirement." AR 172. The Confidence Assessment ratings were defined in Table 4. *Id.*

**Table 4: Performance Confidence Assessments Rating Method**

| Adjectival Rating | Description |
|---|---|
| Substantial Confidence | Based on the offeror's recent/relevant performance record, the Government has a high expectation that the offeror will successfully perform the required effort. |
| Satisfactory Confidence | Based on the offeror's recent/relevant performance record, the Government has a reasonable expectation that the offeror will successfully perform the required effort. |
| Neutral Confidence | No recent/relevant performance record is available or the offeror's performance record is so sparse that no meaningful confidence assessment rating can be reasonably assigned. The offeror may not be evaluated favorably or unfavorably on the factor of past performance. |
| Limited Confidence | Based on the offeror's recent/relevant performance record, the Government has a low expectation that the offeror will successfully perform the required effort. |
| No Confidence | Based on the offeror's recent/relevant performance record, the Government has no expectation that the offeror will be able to successfully perform the required effort. |

AR 175.  As the Solicitation explained, if the Navy determined an offeror's aggregated past performance was Not Relevant, it would assign the offeror a Neutral Confidence rating.  AR 172. Only a Limited Confidence or No Confidence rating would render a proposal unawardable.  AR 173 (advising that a proposal rated as Limited Confidence was not awardable unless the CO in her discretion opened discussions and allowed corrections, but a No Confidence proposal was not susceptible to correction).

For the Price factor, the Solicitation required offerors to submit a completed price table and pricing spreadsheet with their proposals.  AR 169–70.  The Navy evaluated price proposals for price reasonableness and according to methods "solely within the discretion of the contracting officer."  AR 173.

**B.      The Evaluation and Award**

Onésimus and LfW timely submitted proposals prior to the Solicitation's deadline of December 11, 2023.  AR 160, 1006, 1080.  Three other offerors submitted proposals as well.  AR

1256.  The Navy determined that the three proposals were not in accordance with the Solicitation, and as such they were not evaluated.  *Id.*  Based on the following evaluation, the Navy awarded the contract to LfW on February 20, 2024.  AR 1723, 1844.

      1.      <u>Technical Factor</u>

For the Technical factor, the CO determined LfW to have an overall rating of "Good" and gave its proposal the following subfactor ratings.

| Factor [I] – Technical Approach | Rating |
|---|---|
| Subfactor I – Quality Control Plan | Outstanding |
| Subfactor II – Contingency Plan | Acceptable |
| Subfactor III – Sample of Student Guide/Material | Acceptable |
| Overall Factor I: Technical Approach | Good |

AR 1257.  The CO found one significant strength and one strength in LfW's Quality Control Plan proposal.  AR 1257–58.  For the significant strength, the CO determined that:

> [T]he offeror notes they maintain five Certified Safety Professional (CSP).  CSPs are required to recertify annually to maintain the knowledge required as a CSP.  This advanced knowledge allows the offeror to share the latest safety information and are considered experts in the safety field.  This level of expertise exceeds the minimum required experience detailed in Section 3, paragraph 3.2 of the PWS to the considerable advantage of the Government during contract performance.  Having CSPs with proven skills and extensive knowledge in fall protection safely is a benefit since it appreciably increases the chances of successful contract performance by significantly decreasing risk and ensuring accurate training.

*Id.*  For the strength, the CO determined that one of LfW's personnel, a Safety Specialist with prior Navy fall protection training experience, "provides fall protection expertise as a trained Qualified Person, Competent Person, and Competent Tower Climber/Rescuer."  AR 1258.  The CO concluded that this person's extensive experience exceeded the Solicitation's requirements "to the advantage of the Government during contract performance by ensuring low risk and accurate training."  *Id.*  LfW's two other Technical subfactors did not contain any strengths or weaknesses. AR 1258–59.

Onésimus's Technical proposal did not contain any strengths or weaknesses.  AR 1260–62. The CO determined Onésimus to have an overall technical rating of "Acceptable" and gave its proposal the following subfactor ratings.

| Factor [I] – Technical Approach | Rating |
|---|---|
| Subfactor I – Quality Control Plan | Acceptable |
| Subfactor II – Contingency Plan | Acceptable |
| Subfactor III – Sample of Student Guide/Material | Acceptable |
| Overall Factor I: Technical Approach | Acceptable |

AR 1260.

In comparing the offerors' Technical proposals, the CO found LfW to have a "thorough approach" to the requirements and found Onésimus's approach to be "adequate."  AR 1272.  This was reflected in the overall ratings the CO assigned to each proposal.  AR 1273.

    2.    Past Performance Factor

    i.    *LfW*

For the Past Performance factor, the CO determined LfW to have an overall rating of "Satisfactory Confidence."  AR 1264.  Each of LfW's references were recent, as defined by the Solicitation.  AR 1263–64.  And based on customer feedback for each reference, LfW's quality of performance was "uniformly very positive."  AR 1264.

To determine the Relevancy ratings, the CO reviewed the scope and magnitude of LfW's three past performance references.  AR 1263–64.  For LfW's first reference, N0017420P0048, the CO determined the scope was "essentially the same" type of work as described in the PWS because the contract pertained to "comprehensive fall protection competent person training" for "Navy personnel working on ordinances on ships."  AR 1263.  But the CO described the magnitude of this reference in terms of the average annual value of the contract as "substantially less" than the

Solicitation's average annual value.  *Id.*  Considering these determinations, the CO rated the relevancy of LfW's first reference as "Somewhat Relevant."  *Id.*

For LfW's second reference, AGR-0021278, the CO determined the scope was "essentially the same" type of work as described in the PWS because the contract involved developing a fall protection program and customized training courses for a government contractor.  *Id.*  Similar to the first reference, the CO considered the magnitude of this reference in terms of the average annual value of the contract to be "substantially less" than the Solicitation's average annual value. *Id.*  Considering these determinations, the CO rated the relevancy of LfW's second reference as "Somewhat Relevant."  *Id.*

For the third reference, PO-0000007805, the CO determined the scope was "somewhat similar" to the type of work described in the PWS because the contract involved delivering leadership training to personnel at an intelligence agency.  AR 1264.  The CO noted that "[a]lthough the training under this reference does not relate to the training for the instant requirement, the reference still shows that LFW has experience in developing and delivering training to government personnel."  *Id.*  She deemed the magnitude of this reference in terms of the average annual value of the contract to be "significantly less" than the Solicitation's average annual value.  *Id.*  Considering these determinations, the CO rated the relevancy of LfW's third reference as "Somewhat Relevant."  *Id.*

In the aggregate, the CO determined that the overall relevancy of LfW's three past performance references was "Somewhat Relevant" because the scope of the references was essentially the same as the PWS requirements while the magnitude was significantly less.  *Id.*

ii.      *Onésimus*

The CO also assigned Onésimus an overall rating of "Satisfactory Confidence" for the Past Performance factor.  AR 1266.  Each of Onésimus's references was recent, as defined by the Solicitation.  AR 1264.  As with LfW, based on customer feedback for each reference, the quality of Onésimus's performance was also "uniformly very positive."  AR 1266.

The CO reviewed the scope and magnitude of each of Onésimus's three past performance references to determine the Relevancy ratings.  AR 1265–66.  For Onésimus's first reference, N0018916D0012, the CO determined the scope was "essentially the same" type of work as described in the PWS because the contract pertained to CPFP training at nine Navy ashore locations.  AR 1265.  The CO noted that the only difference in scope was that the referenced contract was limited to ashore locations whereas the PWS requires training for afloat, ashore, and aviation safety.  *Id.*  However, she found that the magnitude of this reference in terms of the average annual value of the contract was "significantly less" than the Solicitation's average annual value.  *Id.*  Considering these determinations, the CO rated the relevancy of Onésimus's first reference as "Somewhat Relevant."  *Id.*

For Onésimus's second reference, N0018917D0012, the CO determined that the scope involved a "similar" type of work as described in the PWS because the contract pertained to teaching the Navy's Machinery and Machine Guarding Course.  *Id.*  The CO noted that "[a]lthough the training under this reference is not the exact same training as the instant requirement, it is still safety training and still shows that Onésimus has experience in developing and delivering training to government personnel."  *Id.*  Just as the first reference, the CO found the magnitude of this reference in terms of the average annual value of the contract was "substantially less" than the

Solicitation's average annual value.  *Id.*  Considering these determinations, the CO rated the relevancy of Onésimus's second reference as "Somewhat Relevant."  AR 1266.

For the third and final reference, N0018921D0014, the CO determined the scope was "essentially the same" type of work as described in the PWS.  *Id.*  Under this referenced contract, Onésimus currently delivers comprehensive CPFP training to the Navy.  *Id.*  The CO noted that the number of annual courses under the instant Solicitation was more than double the amount in the referenced contract.  *Id.*  Thus, the magnitude of this reference in terms of the average annual value of the contract was "significantly less" than the Solicitation's average annual value.  *Id.*  Considering these determinations, the CO rated the relevancy of Onésimus's third reference as "Relevant."  *Id.*

In the aggregate, the CO determined that the overall relevancy of Onésimus's three past performance references was "Relevant," considering the single "Relevant" reference, the scope of all three references ("essentially the same" or "similar" to the PWS requirements), and the magnitude of all three references ("less" than the requirement).  *Id.*

       *iii.*     *Past Performance Comparison*

The CO went on to explain why both LfW and Onésimus received a Past Performance Confidence Assessment of "Satisfactory Confidence."  AR 1273.  In comparing the offerors' past performance references, the CO found that both offerors had at least two references with "essentially the same" scope of work, as well as good quality across all references.  *Id.*  The CO also found that one of Onésimus's references was more relevant because its magnitude was more similar to the Solicitation's requirement than the other references.  *Id.*  Nevertheless, the CO determined that the reference's magnitude "was still quite a bit less . . . at only around 14% of the size of the instant requirement."  *Id.*  The CO concluded that "this one difference in magnitude

from one reference was not . . . meaningful enough in order to establish a higher confidence level in Onésimus versus LFW." *Id.*

    3.   <u>Price Factor</u>

Finally, the CO performed a Price factor analysis of LfW's and Onésimus's proposals by comparing the price proposals with each other, with the Independent Government Cost Estimate, and with prices obtained through market research.  AR 1267 (citing FAR 15.404-1(b)(2)(i), 15.404-1(b)(2)(v), and 15.404-1(b)(2)(vi)).  Under each analysis, the CO determined that the proposed prices were fair and reasonable.  AR 1267–68.  Plaintiff does not challenge the Price factor evaluation.

### C.    Procedural Background

On March 1, 2024, Onésimus filed a protest with the Government Accountability Office ("GAO"), claiming that the Navy failed to follow the Solicitation's evaluation criteria, that the Navy used false and negative information about Onésimus to justify initiating the procurement at issue, and that one or more Navy source selection officials had an organizational conflict of interest with LfW.  AR 1939, 1941.  On March 19, 2024, the GAO dismissed Onésimus's protest for failure to meet the minimum pleading standards under GAO regulations.  AR 2508–09.

On June 7, 2024, Onésimus filed its Complaint in the present protest.  *See* Pl.'s Compl., ECF No. 1.  In its Complaint, Onésimus alleges three counts: (1) the Navy arbitrarily departed from the Solicitation's evaluation criteria, (2) the Navy applied unstated evaluation criteria to the evaluation of the proposals, and (3) the Navy treated the offerors unequally.  *Id.* at 12–15.  On July 10, 2024, Onésimus filed its Motion for Judgment on the Administrative Record, arguing that the Navy conducted a disparate evaluation of the Past Performance factor using unstated criteria.  *See* ECF No. 15.  On July 22, 2024, the Government filed its Cross-Motion for Judgment on the

Administrative Record and Response to Plaintiff's motion.  *See* ECF No. 16.  The motions are now

fully briefed.  Pl.'s Resp. to Def.'s Mot. for J. on Admin. R. & Reply, ECF No. 17; Def.'s Reply,

ECF No. 22.  On August 27, 2024, the Court held oral argument.  *See* Minute Entry (Aug. 27,

2024).

## II.   LEGAL STANDARDS

### A.   Motions for Judgment on the Administrative Record

Rule 52.1(c) governs motions for judgment on the administrative record.  Such motions

are "properly understood as . . . an expedited trial on the record."  *Bannum, Inc. v. United States*,

404 F.3d 1346, 1356 (Fed. Cir. 2005).  In contrast to the standard for summary judgment, "the

standard for judgment on the administrative record is narrower" and involves determining, "given

all the disputed and undisputed facts in the administrative record, whether the plaintiff has met the

burden of proof to show that the [challenged action or] decision was not in accordance with the

law."  *Martinez v. United States*, 77 Fed. Cl. 318, 324 (2007) (citing *Bannum*, 404 F.3d at 1357).

Therefore, a genuine issue of disputed fact does not prevent the Court from granting a motion for

judgment on the administrative record.  *See Bannum*, 404 F.3d at 1357.

### B.   Bid Protest Standard of Review

The Tucker Act, as amended by the Administrative Dispute Resolution Act of 1996,

provides the Court of Federal Claims with "jurisdiction to render judgment on an action by an

interested party objecting to . . . the award of a contract or any alleged violation of statute or

regulation in connection with a procurement[.]"  28 U.S.C. § 1491(b)(1).  In such actions, the Court

"review[s] the agency's decision pursuant to the standards set forth in section 706" of the

Administrative Procedure Act.  *Id.* § 1491(b)(4); *see Banknote Corp. of Am., Inc. v. United States*,

365 F.3d 1345, 1350 (Fed. Cir. 2004).  Accordingly, the Court examines whether an agency's

action was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A); *see Impresa Construzioni Geom. Domenico Garufi v. United States*, 238 F.3d 1324, 1332 n.5 (Fed. Cir. 2001).   To prevail in a bid protest, "a protestor must show a significant, prejudicial error in the procurement process." *WellPoint Mil. Care Corp. v. United States*, 953 F.3d 1373, 1377 (Fed. Cir. 2020) (quoting *Alfa Laval Separation, Inc. v. United States*, 175 F.3d 1365, 1367 (Fed. Cir. 1999)); *see also* 5 U.S.C. § 706 ("[D]ue account shall be taken of the rule of prejudicial error.").   A protestor establishes prejudice by showing "that there was a substantial chance it would have received the contract award but for that error." *Alfa Laval*, 175 F.3d at 1367 (quoting *Statistica, Inc. v. Christopher*, 102 F.3d 1577, 1582 (Fed. Cir. 1996)).   An "award may be set aside if either: (1) the procurement official's decision lacked a rational basis; or (2) the procurement procedure involved a violation of regulation or procedure." *Impresa*, 238 F.3d at 1332.

In reviewing an agency's procurement decisions, the Court may not substitute its judgment for that of the agency.  *See Redland Genstar, Inc. v. United States*, 39 Fed. Cl. 220, 231 (1997); *Cincom Sys., Inc. v. United States*, 37 Fed. Cl. 663, 672 (1997); *see also M.W. Kellogg Co. v. United States*, 10 Cl. Ct. 17, 23 (1986) (holding that "deference must be afforded to an agency's . . . procurement decisions if they have a rational basis and do not violate applicable law or regulations").  The disappointed bidder "bears a heavy burden," and the CO is "entitled to exercise discretion upon a broad range of issues . . . ." *Impresa*, 238 F.3d at 1332–33 (citations and quotes omitted).  This burden "is not met by reliance on [the] pleadings alone, or by conclusory allegations and generalities." *Bromley Contracting Co. v. United States*, 15 Cl. Ct. 100, 105 (1988); *see Campbell v. United States*, 2 Cl. Ct. 247, 249 (1983).  A procurement decision is rational if "the contracting agency provided a coherent and reasonable explanation of its exercise of discretion."

14

*Impresa*, 238 F.3d at 1333.  "[T]hat explanation need not be extensive." *Bannum, Inc. v. United States*, 91 Fed. Cl. 160, 172 (2009) (citing *Camp v. Pitts*, 411 U.S. 138, 142–43 (1973)).

In a bid protest, the Court reviews questions of law de novo. *NVT Techs., Inc. v. United States*, 370 F.3d 1153, 1159 (Fed. Cir. 2004).  The interpretation of a solicitation or of procurement regulations presents such questions. *See id.*; *United States v. Boeing Co.*, 802 F.2d 1390, 1393 (Fed. Cir. 1986).  The Court of Federal Claims does not afford deference on questions of law. *See VS2, LLC v. United States*, 155 Fed. Cl. 738, 767 (2021).

## C.     Standing in a Bid Protest

To establish standing in a bid protest, the plaintiff is required to demonstrate that it is an interested party, meaning it "is an actual or prospective bidder[ ] and . . . possesses the requisite direct economic interest." *Rex Serv. Corp. v. United States*, 448 F.3d 1305, 1307 (Fed. Cir. 2006). To show a "direct economic interest," the plaintiff must show that it was prejudiced by the procuring agency's alleged errors by proving it had a "substantial chance" of receiving the contract. *Myers Investigative & Sec. Servs., Inc. v. United States*, 275 F.3d 1366, 1370 (Fed. Cir. 2002).  Put differently, a plaintiff has standing to pursue a bid protest if it demonstrates that "but for the error[s]" challenged in the protest it "would have had a substantial chance of securing" the contract at issue. *Labatt Food Serv., Inc. v. United States*, 577 F.3d 1375, 1378 (Fed. Cir. 2009); *see Alfa Laval*, 175 F.3d at 1367.

In *CACI, Inc.-Federal v. United States*, the Federal Circuit held that § 1491(b)(1)'s interested party requirement presents a question of statutory standing that does not implicate this Court's subject-matter jurisdiction.  67 F.4th 1145, 1151 (Fed. Cir. 2023).  According to *CACI*, the Court may thus choose—but is not required—to make an initial, "preliminary determination ('substantial chance') with respect to the plaintiff's chances of securing the contract" before

addressing the merits. *Id.* at 1152. As the Circuit further observed, the statutory standing issue and the merits issue may overlap, especially where the plaintiff's protest challenges the agency's evaluation of its own bid. *Id.* at 1152–53 (citing *COMINT Sys. Corp. v. United States*, 700 F.3d 1377, 1383 (Fed. Cir. 2012)).

## III.   DISCUSSION

Onésimus's claims of disparate treatment and use of unstated evaluation criteria fail. As demonstrated by the record, the Navy properly and consistently evaluated proposals in accordance with the Solicitation's Past Performance requirements, and rationally explained its Relevancy ratings for each Past Performance reference as well as for the overall Confidence Assessment ratings. Onésimus's mere disagreement with the Navy's assignment of those ratings does not provide a reason to overturn the award. Furthermore, Onésimus's additional claim alleging an unreasonable, disparate downgrade of its Technical factor proposal is not properly before the Court and, in any event, is unavailing.

### A.   The Navy Did Not Disparately Evaluate Proposals.

Onésimus alleges that the Navy failed "to treat all offerors fairly and impartially" by disparately evaluating the proposals under the Past Performance factor. ECF No. 15 at 16–17. To prevail in a disparate treatment claim, "a protestor must show that the agency unreasonably downgraded its proposal for deficiencies that were 'substantively indistinguishable' or nearly identical from those contained in other proposals" or that "the agency inconsistently applied objective solicitation requirements between it and other offerors." *Off. Design Grp. v. United States*, 951 F.3d 1366, 1372–73 (Fed. Cir. 2020) (internal citations omitted). Onésimus argues that the Navy's evaluation implicates the latter standard. ECF No. 15 at 13–14, 18; *see* Oral Arg. Tr. at 8:15–9:10, ECF No. 24.

Although Onésimus's arguments are styled as a disparate treatment claim, they can also be construed as allegations that the Navy improperly applied the Solicitation's requirements. *See, e.g.*, ECF No. 15 at 19 ("[T]he First and Second Contracts [in Onésimus's proposal] were essentially the same in scope as the Solicitation's requirements and should have been deemed Very Relevant . . . ."); *id.* at 21 ([T]here is no indication that the Navy truly evaluated relevancy in accordance with the terms of the Solicitation . . . ."); *see also* ECF No. 24 at 13:4–11. In that context, the typical arbitrary and capricious standard applies, as Onésimus recognizes. *See* ECF No. 15 at 14; ECF No. 17 at 6–7. As such, the Court must determine whether the CO acted rationally and within her discretion when applying the Solicitation's evaluation criteria for Past Performance, or whether, as Onésimus argues, she applied the criteria inconsistently. *See Ascendant Servs., LLC v. United States*, 160 Fed. Cl. 275, 282–83 (2022); *Ala. Aircraft Indus., Inc.–Birmingham v. United States*, 586 F.3d 1372, 1375 (Fed. Cir. 2009) (quoting *Motor Vehicle Mfrs. Ass'n of the United States v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)). Based on the Administrative Record, the Court finds that the Navy evaluated the two proposals consistent with the Solicitation and provided a rational explanation of the award decision. *See* AR 1271–74.

At the center of Onésimus's protest is the CO's assessment of the scope and magnitude of the offerors' Past Performance references and assignment of the Relevancy ratings. Onésimus argues that the Navy improperly evaluated LfW's references as "Somewhat Relevant" when they were in fact "severely limited" in scope and had a fraction of the magnitude required by the Solicitation. ECF No. 17 at 11. In contrast, Onésimus contends that two of its Past Performance references should have been rated "Very Relevant" based on the similarity of their scope to the Solicitation requirements. ECF No. 15 at 19. Onésimus asserts that by assessing LfW as "Somewhat Relevant," the CO "qualitatively equated almost no relevant experience with

[Onésimus's] patently relevant experience."  ECF No. 17 at 12.  Onésimus further argues that the CO "penalized" its proposal based on the low magnitude of its references, whereas the CO "credited" LfW's proposal despite also having references with low magnitude.  ECF No. 15 at 19.  According to Onésimus, this constituted a "clear departure from the Solicitation's relevancy standards" because "none of LFW's past performance references were relevant under the definitions set forth by the Solicitation."  *Id.* at 18.

The Solicitation set out the definition of Relevancy in terms of the scope and magnitude of an offeror's reference.  *See* AR 175.  The Relevancy rating assigned depended on the degree of similarity between the scope and magnitude of the reference and the effort the Solicitation required.  *See* AR 1252 ("Scope: Experience in the areas described in the PWS.  Magnitude: The similarity of the dollar value of actually performed work that exists between the PWS and the offeror's referenced contracts . . . .").  The critical fact here is that each Past Performance reference for both LfW and Onésimus involved a higher degree of similarity for scope than it did for magnitude.

According to Onésimus, "if a past performance reference involved the same scope but none of the magnitude, it cannot be assigned anything other than not relevant, because both [scope and magnitude] have to be addressed."  ECF No. 24 at 11:19–22; *see* ECF No. 17 at 11 (arguing that the CO departed from the Solicitation's requirements by failing to evaluate the Past Performance references' scope and magnitude "together").  In other words, to be "Very Relevant," for example, the reference must have "essentially the same" scope *and* "essentially the same" magnitude.  By this interpretation, if either scope or magnitude is so low in comparison with the Solicitation's level of effort, then the CO must apply the lowest applicable adjectival rating for Relevancy.  *See* ECF No. 24 at 11:23–12:3.  As a result, Onésimus contends LfW's references should have received

ratings of "Not Relevant" because of their relatively low magnitude and little-to-no relevant scope. *See* ECF No. 15 at 17–18; *see also* ECF No. 17 at 11 (arguing that LfW's references were a fraction of the magnitude of the Solicitation's requirement, whereas Onésimus's were "far greater in magnitude").

As an initial matter, the Court disagrees with this interpretation of the Relevancy rating definitions. Although the Solicitation does not specifically instruct the CO on how to rate a reference with a scope and magnitude of opposite degrees of similarity, neither does it require a references' scope and magnitude to separately meet a rating definition to receive that rating. *See* AR 175. And a requirement that mandates assignment of the lowest relevancy rating applicable to either the scope or magnitude of a reference would be a harsh result in the absence of specific instructions to that end. Rather, the CO reasonably assigned a middle ground rating where the scope of the reference was more similar, but the magnitude was not. *See* AR 1263–66. So, a reference with "essentially the same" scope (warranting a "Very Relevant" under the rating definitions) and "substantially less" magnitude (warranting a "Not Relevant") was assigned a rating in the middle (*i.e.*, "Somewhat Relevant"), taking into account both aspects of the Relevancy rating definitions. *See, e.g.*, AR 1263 (Reference #1), 1265 (Reference #1). This application of the Relevancy ratings is consistent with the Solicitation's holistic approach to determining overall Relevancy. The Solicitation expressly recognized that each of the offerors' Past Performance references may not satisfy the full scope or magnitude of the PWS. *See* AR 169. That is why the CO would use "[t]he aggregate of each offeror's past performance references in terms of scope

and magnitude" to "assess[] overall relevance of that offeror's past performance."[2]  AR 172; *see* AR 169 ("The references will be evaluated in the aggregate . . . .").

Moreover, contrary to Onésimus's argument, the record shows that the CO consistently evaluated LfW's and Onésimus's Past Performance references, considering both the scope and magnitude of each.  Where the reference involved the offeror providing CPFP training to the Government or government contractors, the CO found "essentially the same scope."  AR 1263 (References #1, 2), 1265–66 (References #1, 3).  Where the reference did not involve CPFP training, but nonetheless concerned training provided to the Government, the CO found "somewhat similar" or "similar" scope.  AR 1264 (Reference #3), 1265 (Reference #2).  For five of the six total references identified, where the average annual value of the contract was between 1.6 percent and 10.1 percent of the average annual value of the Solicitation, the CO determined the references had "significantly less" or "substantially less" magnitude.  AR 1263–64 (References #1–3), 1265–66 (References #1, 2).  Given the substantially similar findings, each of the five references was rated overall as "Somewhat Relevant."  AR 1263, 1264–65.  The one Onésimus reference that involved 30.9 percent of the average annual value of the Solicitation, the highest magnitude of all references, received the higher overall rating of "Relevant."  AR 1266; *see* AR 1273 (noting that the reference is "14% of the size of the instant requirement").  And ultimately the CO assessed a higher aggregate Relevancy rating for Onésimus than LfW in part due to this

---

[2] Even if the Court were to accept Onésimus's interpretation, given the CO's findings, both LfW *and* Onésimus would have been rated "Not Relevant" for each Past Performance reference because each reference had a low magnitude compared to the Solicitation.  Onésimus conceded as much at argument, at least with respect to the first two references in its proposal.  *See* ECF No. 24 at 11:23–12:20.  In such case, Onésimus could hardly show prejudice, as Onésimus benefited from the CO's application of the Relevancy ratings in the same way that LfW did.  *See G4S Secure Integration LLC v. United States*, No. 21-1817C, 2022 WL 211023, at *8 (Fed. Cl. Jan. 24, 2022) ("There has been no prejudice when a bid protestor benefited from the same potentially unlawful discretion from which the awardee benefited.").

distinction.  *See id.*  Far from being "jarring and inexplicable," ECF No. 15 at 21, the CO's assessment was reasonable and supported by the record.  Other than expressing mere disagreement with the assigned relevancy ratings, Onésimus has failed to show that the CO did not rationally explain her evaluation or that the CO's decision was "so implausible" that it does not fall within her discretion.  *Ala. Aircraft Indus.*, 586 F.3d at 1375; *see Sci. Applications Int'l Corp. v. United States*, 108 Fed. Cl. 235, 248 (2012).

The CO similarly provided a rational explanation for her Confidence Assessment.  Onésimus argues that the CO departed from the Solicitation's requirements by assigning a "Satisfactory Confidence" assessment to both LfW and Onésimus, even though LfW had three "Somewhat Relevant" references as compared to Onésimus's two "Somewhat Relevant" references and one "Relevant" reference.  ECF No. 15 at 12; *see also* ECF No. 24 at 16:6–16.  Onésimus contends that the CO's determination that the single instance of a higher magnitude in one of its references was "not meaningful enough to warrant a higher confidence level" demonstrates this departure.  ECF No. 15 at 13; *see also* ECF No. 24 at 14:7–17.  But the Past Performance Confidence Assessment was not a tally of an offeror's relevancy ratings or the sum of the magnitude of the past contracts' values.  *See* AR 172–73; *see also* ECF No. 24 at 15:21–16:5.  As noted above, the Confidence Assessment was "based on the overall quality of the recent and relevant past performance" and "also consider[ed] the source of the information, the context of the data, and general trends in the offeror's performance."  AR 172.  Additionally, the Solicitation listed several other data sources the CO could utilize in making the Confidence Assessment.  AR 173 (explaining that the CO may also contact an offeror's reference to verify performance and may "obtain information for use in the evaluation of past performance from *any and all sources*, including sources outside of the Government" (emphasis added)).  As such, the

21

Solicitation made clear that the Confidence Assessment would not be a rote calculation of Relevancy ratings, but rather a comprehensive and highly discretionary determination made by the CO.  *See* AR 172–73; *see also* ECF No. 24 at 17:3–11.  The CO reasonably exercised her judgment in determining that Onésimus's one "Relevant" rating was not meaningful enough to warrant a higher Confidence Assessment.  The Court will not second guess that judgment here.  *See E.W. Bliss Co. v. United States*, 77 F.3d 445, 449 (Fed. Cir. 1996).

In sum, the CO's evaluation of the Past Performance factor was rational, consistent, and in accordance with the Solicitation's requirements.  "The court will not disturb ratings assigned by the agency absent a showing that they have no rational basis."  *Sci. Applications Int'l*, 108 Fed. Cl. at 248.  Onésimus has failed to make that showing.  While the Court is sympathetic to Onésimus's position as the incumbent contractor, "[m]ere disagreement with agency evaluations" does not demonstrate that the CO's findings were arbitrary and capricious.  *Id.*

## B.    Plaintiff's Other Claims Also Fail.

Onésimus also alleges that the Navy applied unstated evaluation criteria when reviewing the offerors' proposals.  ECF No. 15 at 19.  It argues that despite the "significant difference" between the Past Performance references of Onésimus and LfW, the CO assigned the same confidence rating to each proposal.  *Id.* at 20.  Onésimus further argues that the CO "conducted her own evaluation" and "unjustifiably" concluded that the two offerors' references were similar in scope and magnitude.  *Id.* at 21.

To prevail on an unstated evaluation criteria claim, a plaintiff must show that the agency "used a significantly different basis in evaluating the proposals than was disclosed" and that "it has been prejudiced as a result."  *Wellpoint Mil. Care Corp. v. United States*, 144 Fed. Cl. 392, 404 (2019), *aff'd*, 953 F.3d 1373 (Fed. Cir. 2020).  Here, Onésimus has not shown that any criteria

other than those in the Solicitation were considered in the evaluation.  In effect, Onésimus's argument that the CO "applied her own definitions" to the relevancy evaluation, ECF No. 15 at 20, is the same argument it made in support of its disparate treatment claim, *id.* at 18.  As such, the Court's conclusion is the same.  Onésimus's mere disagreement with the CO's ratings does not satisfy its burden to show that the CO applied unstated criteria or otherwise conducted an arbitrary and capricious evaluation.[3]  *See Sci. Applications Int'l*, 108 Fed. Cl. at 248.

In its responsive brief, Onésimus also introduced a claim based on the CO's evaluation of the Technical factor.  *See* ECF No. 17 at 9.  Onésimus argues that the CO unreasonably "downgraded" its proposal by failing to credit Onésimus for similar aspects of its Technical proposal that earned LfW a significant strength and strength.  Specifically, Onésimus notes that the Navy "credited" LfW for certifications held by its instructors and for the military service history of one of its professionals while downgrading Onésimus's proposal.  *Id.* at 9–10.  As Onésimus conceded at argument, this claim was not pled in the Complaint.  ECF No. 24 at 6:4–11.  It was also not raised in Onésimus's opening brief, nor was it fairly raised as a response to an argument made in the Government's opening brief.  *See* ECF No. 22 at 6.  The claim is therefore not properly before the Court and, in any event, is waived.  *SmithKline Beecham Corp. v. Apotex Corp.*, 439 F.3d 1312, 1319 (Fed. Cir. 2006).

Even if the Court were to consider the claim, it must be rejected.  Onésimus has not shown that its Technical proposal was "downgraded" at all.  *See* AR 1262 (finding Onésimus's Technical proposal had "no significant strengths, strengths, weaknesses, significant weaknesses, deficiencies, or uncertainties" and that the proposal met requirements and indicated "an adequate

---

[3] Because Onésimus has failed to show a procurement error, the Court need not reach the question of whether it has established prejudice.

approach and understanding of the requirements"). Moreover, Onésimus did not propose instructors with the same Certified Safety Professional ("CSP") certification, as LfW did. *Compare* AR 1084–86, 1097 (Onésimus) (representing generally that "Onésimus Defense instructors are all credentialled through numerous accreditation organizations," AR 1084) *with* AR 1022–24 (LfW) (specifically identifying instructors with CSP certification). Nor did Onésimus's proposal provide the same level of individualized detail about its instructors' fall protection safety training experience and military service history as LfW's proposal did. *Compare* AR 1097 (Onésimus) (providing instructor skills matrix) *with* AR 1022–23 (LfW) (providing individual instructor biographies). As such, Onésimus has not shown that its Technical proposal was "'substantively indistinguishable' or nearly identical" to LfW's proposal in these respects but was unequally evaluated, as is required to succeed on a disparate treatment claim. *Off. Design Grp.*, 951 F.3d at 1372–73.

## C.    No Injunctive Relief Is Warranted Because Onésimus Fails on the Merits.

A party seeking permanent injunctive relief must show that: (1) it "has succeeded on the merits of the case;" (2) it "will suffer irreparable harm if the court withholds injunctive relief;" (3) "the balance of hardships to the respective parties favors the grant of injunctive relief;" and (4) "it is in the public interest to grant injunctive relief." *PGBA, LLC v. United States*, 389 F.3d 1219, 1228–29 (Fed. Cir. 2004). Because Onésimus has not succeeded on the merits of its protest, no injunctive relief is warranted in this case. *See Mitchco Int'l, Inc. v. United States*, 26 F.4th 1373, 1384 n.7 (Fed. Cir. 2022); *ANHAM FZCO v. United States*, 149 Fed. Cl. 427, 439 (2020) (quoting *Dell Fed. Sys., L.P. v. United States*, 906 F.3d 982, 999 (Fed. Cir. 2018)).

## IV.    CONCLUSION

Based on the foregoing, the Court holds that the Navy did not disparately evaluate Onésimus nor use unstated evaluation criteria in evaluating the offerors' proposals. The CO acted

reasonably and within the scope of her discretion.  Therefore, the Court **DENIES** Plaintiff's Motion for Judgment on the Administrative Record (ECF No. 15) and **GRANTS** Defendant's Cross-Motion for Judgment on the Administrative Record (ECF No. 16).  The Clerk is directed to enter judgment accordingly.

       **SO ORDERED**.


Dated: September 16, 2024                      */s/ Kathryn C. Davis*
                                       KATHRYN C. DAVIS
                                       Judge